**SEATTLE–FIRST NATIONAL BANK, a national banking association, Plaintiff,**

v.

**James CARLSTEDT, et al., Defendants.**

Nos. CIV–83–2425–B, CIV–83–2428–B, CIV–83–2485–B, CIV–83–2487–B, CIV–83–2544–B, CIV–83–2548–B, CIV–83–2555–B and CIV–83–2564–B.

United States District Court, W.D. Oklahoma.

Aug. 20, 1987.

---

Russell L. Mulinix, Hastie & Kirschner, Oklahoma City, Okl., for plaintiff.

James M. Shuler, Kaas, Hodges & Massari, Tampa, Fla., Larry D. Patton, Oklahoma City, Okl., for defendants.

## ORDER GRANTING PLAINTIFF'S SECOND MOTION FOR SUMMARY JUDGMENT

BOHANON, District Judge.

## I.

## INTRODUCTION

A. *Background.*

This is a collection action filed in October 1983. The cases were begun by Seattle–First National Bank ("Seattle–First") against 35 defendants (the "defendants"), including Bernard Edwards (the "defendant"), to enforce notes which these defendants executed in favor of Penn Square Bank ("Penn Square") in order to purchase limited partnership interests in an oil and gas tax shelter, Onyx Private Drilling Program, Ltd.–1981 ("Onyx Program"). The

individual collection lawsuits were consolidated by order of this court on November 9, 1983.

At the outset of this case, on January 30, 1984, the defendants raised a counterclaim and asserted various affirmative defenses against enforcement of their notes. The counter-claim and defenses involved identical allegations that Seattle–First, either personally or by virtue of its status as assignee of the Penn Square notes or Penn Square's relationship as "agent bank" in a participation sold to Seattle–First, committed violations of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5. Defendants also sought to state claims for violations of Oklahoma Blue Sky Law and for common law fraud.

### B. *The Bank's Motion to Dismiss Defendants' Counterclaim.*

Seattle–First responded to the counterclaim on March 6, 1984, with a motion to dismiss, pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6), asserting that the fraud and securities fraud allegations were not pleaded with the particularity required to state a claim. The District Court agreed and granted that motion to dismiss on April 25, 1984. *See Seattle–First National Bank v. Carlstedt,* 101 F.R.D. 715, 716–26 (W.D. Okla.1984), *rev'd,* 800 F.2d 1008 (10th Cir. 1986).

Immediately thereafter, the defendants moved to amend their counterclaim. The Court denied this motion on May 17, 1984, on the grounds that

the proposed amended pleading contains no new allegations that would bring the counterclaim within the limits of Fed.R. Civ.P. 9(b) and is no different in reality from the original.

*Seattle–First National Bank v. Carlstedt,* 101 F.R.D. at 726.

### C. *The Bank's First Motion for Summary Judgment.*

On May 4, 1984, Seattle–First filed its first motion for summary judgment on its promissory notes. On May 21, 1984, the defendants offered various affidavits in opposition. These affidavits ostensibly supported their affirmative defenses—which were identical to the counterclaim previously dismissed by the Court—but primarily attacked the reputation and financial acumen of Penn Square. The defendants offered no evidence of any securities fraud relating to the Onyx Program. Thus, they complained that one of the other defendants (Mr. Carlstedt) had represented to them that Penn Square "endorsed ... the Onyx Program as an investment" but did not tell them that Penn Square would obtain upstream participation or that the Oklahoma bank was not "soundly managed in a businesslike manner." They also asserted, without explanation or support, that Penn Square's motivation "to provide financing" for the Onyx Program "was to assist Ramco [the general partner] in obtaining immediate revenue to retire a short-term debt ... and increase its revolving line of credit." In identical affidavits, the defendants unanimously averred that had Carlstedt told them these facts, they would never have purchased interests in the Onyx Program. The defendants also submitted another affidavit, by a Ramco director, Mr. Belcher, who said that one of the employees at Penn Square "knew and approved of" the use of Penn Square's name as a Ramco reference.

The information offered in the affidavits contained no evidence which would link Seattle–First to any fraudulent conduct and no evidence that would even support a cause of action against Penn Square. Accordingly, the Court held on May 25, 1984, that the defendants' affirmative defenses were legally and factually insufficient and that, pursuant to Fed.R.Civ. 56, the Bank was entitled to summary judgment on its promissory notes.

The District Court stated that the Bank's summary judgment was "good under all the pleadings and ... should be granted," and reiterated its concern about "the defendants' continuing attempt to interpose irrelevant issues in this simple action to collect on promissory notes." Order of May 25, 1984 at 2. After carefully review-

ing the various affidavits offered by the defendants, the Court concluded that they:

> contain nothing new that would implicate Seattle–First in any violation of federal or state securities laws, whether defendants would choose to press that issue as a counterclaim or as a defense to the action on these notes, and the court finds reason in this most recent material to reiterate its belief that defendants are interposing these claims merely to harass Seattle–First with "strike suit" issues. There is still nothing more tangible than an aspersion cast upon Seattle–First's relationship with Penn Square in the making of these notes. Defendants have deliberately attempted to mislead the court by misconstruing Penn Square's function as agent *for collection* under the original participation agreement to be a different kind of agency involving the *making* of the notes.

*Id.* at 2. The Court again reminded the defendants that lending money pursuant to a participation agreement was a normal and routine banking function. *Id.* at 2–3. After the original notes were produced and admitted into evidence, the District Court entered final judgment in Seattle–First's favor on May 29, 1984.

### D. *Tenth Circuit Appeal.*

All defendants except for S. Lee Puckett Management Company and S. Lee Puckett appealed these decisions to the United States Court of Appeals for the Tenth Circuit. They raised a number of legal challenges to the District Court's rulings, including its decision to grant Seattle–First's motion to dismiss the counterclaim and its decision to grant Seattle–First's motion for summary judgment. During the appeals process, numerous defendants settled with the Bank and dismissed their appeals. Only seven remained as active appellants when the Tenth Circuit ruled.

On September 8, 1986, the Tenth Circuit issued its decision in *Seattle–First National Bank v. Carlstedt,* 800 F.2d 1008 (10th Cir.1986). The Tenth Circuit held:

> Defendants raise several issues on appeal. Only one, however, is dispositive: whether the district court erred in dis-

missing defendants' counterclaim alleging federal securities fraud violations for failure to comply with the requirements of Rule 9(b) with the Federal Rules of Civil Procedure. We hold that the district court erred as a matter of law in dismissing defendants' counterclaim. We must therefore reverse.

*Id.* at 1010.

In its opinion, the Tenth Circuit agreed with this Court and concluded that Rule 9(b) was, in fact, applicable to claims arising under the federal securities laws, but differed in its application of Rule 9(b), finding that the counterclaim and amended counterclaim satisfied the Rule's requirements. More importantly—and of direct relevance to the instant motion—the Tenth Circuit agreed with this Court on the fundamental *legal* issue presented by Seattle–First's Rule 9(b) motion: that aiding and abetting liability under the federal securities laws may not be imposed for the performance of routine or normal banking functions, such as the lending of money or the selling of a participation interest in a loan. 800 F.2d at 1011 n. 2.

Despite the defendants' invitation, the Tenth Circuit declined to disturb the District Court's decision awarding summary judgment in favor of Seattle–First on its promissory notes and rejecting their affirmative defenses. Indeed, the Tenth Circuit expressly noted that the defendants' challenge to the Rule 9(b) dismissal order was the only one of their arguments which was "dispositive." *Id.* at 1010.

### E. *Remand to the District Court.*

The matter returned to the District Court. On February 20, 1987, Seattle–First filed its second motion for summary judgment. This second motion for summary judgment was directed to the counterclaim only, because Seattle–First argued that the rest of this Court's decisions had been left standing on appeal. *See, e.g., Mutual Life Insurance Co. v. Hill,* 193 U.S. 551, 553–54, 24 S.Ct. 538, 538–39, 48 L.Ed. 788 (1904) (judgment of reversal on appeal "is not necessarily an adjudication

by the appellate court of any other than the questions in terms discussed and decided").

The correct interpretation of Rule 9(b) is no longer before the Court. On a summary judgment motion, the nonmoving party "may not rely upon the allegations ... of his pleading." Fed.R.Civ.P. 56(e). Indeed, the major purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Whether the pleading of the counterclaim satisfies the particularity standards outlined by the Tenth Circuit in this case is, therefore, irrelevant at this stage of the proceedings.

## II.

### LEGAL ANALYSIS

A. *Summary Judgment Standards.*

As this case demonstrates, the summary judgment motion has replaced the motion to dismiss as a tool for isolating and disposing of factually insufficient claims. According to the Supreme Court:

Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." ... Before the shift to "notice pleading" accomplished by the Federal Rules, motions to dismiss a complaint or to strike a defense were the principal tools by which factually insufficient claims or defenses could be isolated and prevented from going to trial with the attendant unwarranted consumption of public or private resources. But with the advent of "notice pleading," the motion to dismiss seldom fulfills this function anymore, and its place has been taken by the motion for summary judgment. Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *see also Windon Third Oil & Gas Drilling Partnership v. FDIC*, 805 F.2d 342, 397 (10th Cir.1986) (adopting *Celotex* standards).

Thus, in opposing summary judgment, the defendant must present probative evidence to establish that his counterclaim has merit and may no longer rely on mere conclusions. In this case, the Court rendered summary judgment in favor of the plaintiff on the validity and default of the notes held by Seattle–First and on the amounts due on each of these notes as of May 29, 1984, as well as the substance of the defendant's asserted defenses. The counterclaim asserted by the borrower to stave off liability on the notes he signed and for which he received full value is nothing more than a rehash of those defenses.

B. *The Defendant Has No Actionable Counterclaim Directly Against Seattle–First.*

The defendant's counterclaim for acts and omissions by Seattle–First is contradicted by the undisputed evidence in the record, which establishes that the Bank had no involvement whatsoever in the sale of Onyx Program interests in November 1981. It is uncontradicted that Seattle–First was not involved until it purchased a participation interest in the Onyx loans the following month.

Under the express terms of Section 10(b) of the 1934 Act and Rule 10b–5, liability may be premised only upon misconduct that occurs "in connection with" the purchase or sale of securities. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). Activities that occur after a plaintiff's purchase of a security cannot form the basis for liability under Rule 10b–5. *See e.g., Benoay v. Decker*, 735 F.2d 1363 (6th Cir.

1984); *Denny v. Barber,* 576 F.2d 465, 468–69 (2d Cir.1978); *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890–91 (2d Cir.1972); *Hudson v. Capital Management International, Inc.,* 565 F.Supp. 615, 621–22 (N.D.Cal.1983); *Shamrock Associates v. Moraga Corp.,* 557 F.Supp. 198, 204 (D.Del.1983); *Zatkin v. Primuth,* 551 F.Supp. 39, 43 (S.D.Cal.1982); *Trostle v. Nimer,* 510 F.Supp. 568 (S.D. Ohio 1981); *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1088 (N.D. Cal.1979); *Wolford v. Equity Resources Corp.,* 424 F.Supp. 670, 671 (S.D.Ohio 1976); *Pittsburgh Coke & Chemical Co. v. Bollo,* 421 F.Supp. 908, 923 (E.D.N.Y.1976), *aff'd on other grounds,* 560 F.2d 1089 (2d Cir.1977).

■ In this case, the sale of securities occurred in November 1981, culminating in the filing of the Onyx Program's certificate of limited partnership with the Oklahoma Secretary of State on November 30, 1981. All of the notes which these defendants executed to obtain funds from Penn Square to purchase their interests in the Onyx Program were dated November 23, 1981. There is no evidence of any activity by Seattle–First regarding the loans to the Onyx investors until December 15, 1981, when the Bank provided $3,900,000 to Penn Square Bank in order to purchase a participation interest in the Onyx loans. The defendant further admits that he had no knowledge of any connection between Seattle–First and his loans until late 1982, after the FDIC had taken over Penn Square.

For identical reasons, the defendant's claims against Seattle–First under the Oklahoma Blue Sky Law must be dismissed as well. The Oklahoma securities fraud statutes, 71 Okla.Stat. §§ 101–502, are based upon the Uniform Securities Act, as amended in 1958, which in turn was based on the federal securities laws. Like the federal statute, 71 Okla.Stat. § 101 mandates liability only "in connection with" the offer, sale or purchase of any security.

■ Likewise, Seattle–First is not liable for ordinary fraud, either constructive or actual, under Oklahoma law. According to 15 Okla.Stat. § 58, actionable fraud consists of certain activities undertaken "with intent to deceive another party ... or to induce him to enter into [a] contract." The record reveals no activity by Seattle–First that would fall into this category. Indeed, the Bank could not and did not make any representations designed to induce the defendant to purchase interests in the Onyx Program because it was not even involved in the transaction at that time.

C. *The Defendant Has No Basis for Imposing Vicarious Liability Upon Seattle–First for the Acts or Omissions of Penn Square.*

■ The defendant also alleges that Seattle–First should be held liable because its "agent" in the participation, Penn Square, allegedly aided and abetted or otherwise is liable for alleged securities fraud committed by promoters of the Onyx Program. The Court doubts that such an agency relationship existed at the time the securities were marketed.[1] The only evidence of the alleged "agency" offered by the defendant is the participation relationship which arose after December 15, 1981, when Seattle–First purchased its interest in the Onyx loans made by Penn Square. No evidence has been offered by the defendant to establish the existence of an agency relationship at the time the securities were allegedly

---

1. Indeed, there is some question as to whether "agency" or *respondeat superior* theories state a basis for recovery under the federal securities laws. *See, e.g., Zweig v. Hearst Corp.,* 521 F.2d 1129 (9th Cir.), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *Rochez Brothers, Inc. v. Rhoades,* 527 F.2d 880 (3d Cir.1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). *See generally* Ferrera & Singer, *Derivative Liability in Securities Law: Controlling Person Liability, Respondeat Superior and Aiding and Abetting,* 40 Wash. & Lee L.Rev. 1007, 1015–22 (1983). *Compare Kerbs v. Fall River Industries, Inc.,* 502 F.2d 731, 740–41 (10th Cir.1974) and *Richardson v. MacArthur,* 451 F.2d 35 (10th Cir.1971). As this Court noted in its decision on the Bank's motion to dismiss, the defendants propose to go one step further and in effect create double vicarious liability.

purchased by the defendant.[2]

Even if Seattle–First could be held vicariously liable for acts and omissions of Penn Square, however, the defendant's counterclaim would still be legally insufficient. Defendant has articulated two possible theories of securities liability against the banks. First, they allege that the banks aided and abetted the alleged securities fraud committed by the promoter of the Onyx Drilling Program. Second, they assert that Seattle–First or Penn Square was a "controlling person" of Ramco, the general partner and promoter of the Onyx Program, simply because Penn Square lent substantial sums of money to that company. Neither theory offers a basis for relief.

### 1. *Aiding and Abetting Liability.*

█ In order to establish aiding and abetting liability, the defendant must, among other things, offer evidence that Seattle–First or its alleged "agent," Penn Square, assisted a securities law violation knowingly and substantially. *See Armstrong v. McAlpin*, 699 F.2d 79, 81 (2d Cir.1983); *Harmsen v. Smith*, 693 F.2d 932, 943 (9th Cir.1982), *cert. denied*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Decker v. SEC*, 631 F.2d 1380, 1386–88 (10th Cir.1980). Numerous courts have held that the "substantial assistance" requirement is not satisfied by a showing that the bank or other financial institution lent money or performed other routine financial services in connection with a securities transaction.[3]

Obviously, of most pressing significance is the Tenth Circuit's holding in this case that routine banking practices cannot form the basis for aiding and abetting liability. *Seattle–First National Bank v. Carlstedt*, 800 F.2d at 1011 n. 2. Other appellate opinions have adopted a similar view. *See,*

*e.g., Admiralty Fund v. City National Bank*, 677 F.2d 1315, 1316–17 (9th Cir.1982) (holding that bank which performed typical financial services in connection with the sale of securities is not thereby subject to liability under the 1934 Act); *Grimes, Hooper & Messer, Inc. v. Pierce*, 519 F.2d 1089 (9th Cir.1975) (holding that allegations that bank's conduct permitted securities wrongdoer to create "a false aura of financial and moral respectability ... essential to the fraudulent scheme" were insufficient to establish securities fraud liability).

District court decisions are in general agreement with the basic proposition that the lending of money or performance of other regular banking operations is insufficient to create aiding and abetting liability. *See, e.g., Schlifke v. Seafirst Corp.*, [Current Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,107 (N.D.Ill.1987) [Available on WESTLAW, 1987 WL 4718]; *Delaney v. Blunt, Ellis & Loewi*, 631 F.Supp. 175, 181 (N.D.Ill.1986); *Wright v. Schock*, 571 F.Supp. 642, 662–64 (N.D.Calif.1983), *aff'd on other grounds*, 742 F.2d 541 (9th Cir.1984); *see also Weinberger v. Kendrick*, 432 F.Supp. 316, 322 (S.D.N.Y.1977); *Clark v. Cameron–Brown Co.* [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,539 (M.D.N.C.1980) [Available on WESTLAW, 1980 WL 1416]; *Getz v. Central National Bank of Greencastle*, 147 Ind.App. 356, 261 N.E.2d 81, 85 (1970); *Empire Trust Co. v. Smith* [1964–66 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,581 (N.Y.Sup.Ct.1965).

█ Moreover, mere silence or inaction by the banks cannot substitute for the "substantial assistance" requirement in these circumstances. A failure to disclose is actionable only when a duty of disclosure exists. A duty to disclose arises only when one party has information that the other is

---

**2.** To the extent that the defendant seeks to state a cause of action for fraud or Blue Sky violations against Seattle–First, based upon an alleged agency relationship with Penn Square, the Court notes the total absence of any evidence that such a relationship existed at the time the alleged misrepresentations took place. *See Texaco, Inc. v. Layton*, 395 P.2d 393, 395–97 (Okla. 1964); *Allison v. Gilmore, Gardner & Kir, Inc.*, 350 P.2d 287, 292 (Okla.1960).

**3.** Furthermore, aiding and abetting liability also requires proof of knowledge by the aider and abettor of the *fraud*, not merely the undisclosed material facts. *See Baranski v. Serhant*, 603 F.Supp. 232 (N.D.Ill.1985). *See generally Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir.1975).

entitled to know *because of* a fiduciary or other similar relation of trust and confidence between them. *Chiarella v. United States,* 445 U.S. 222, 228, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980); *Windon Third Oil & Gas Drilling Partnership v. FDIC,* 805 F.2d at 347. Under the federal securities laws, a lender owes no fiduciary or other duty to borrowers or other parties who invest in securities. *Schlifke v. Seafirst Corp.* at 95,443; *Hill v. Equitable Bank, N.A.,* 599 F.Supp. 1062, 1080–81 (D.Del.1984); *D & G Enterprises v. Continental Illinois National Bank & Trust Co.,* 574 F.Supp. 263, 269 (N.D.Ill.1983); *Noonan v. Granville–Smith,* 537 F.Supp. 23, 27–28 (S.D.N.Y.1981); *In re Falstaff Brewing Corp. Antitrust Litigation,* 441 F.Supp. 62, 69 n. 4 (E.D.Mo.1977). *See also Weinberger v. Kendrick,* 698 F.2d 61, 79 (2d Cir.1982), *cert. denied,* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983). Absent such a duty, neither Seattle–First nor Penn Square can be held liable for mere silence, inaction, or nondisclosure about the Onyx Program. *Barker v. Henderson, Franklin, Starnes & Holt,* 797 F.2d 490, 495–96 (7th Cir.1986); *Cleary v. Perfectune, Inc.,* 700 F.2d 774, 778 (1st Cir.1983); *Wessel v. Buhler,* 437 F.2d 279, 283 (9th Cir.1971); *Landy v. FDIC,* 486 F.2d 139, 161–62 (3d Cir.1973), *cert. denied,* 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

Finally, to the extent that the defendant seeks to base his claims of securities fraud upon nondisclosures about *Penn Square's* ability or financial skills or upon whether the loans would be "upstreamed" to Seattle–First, the Court observes that this information does not pertain to the limited partnership interests in the Onyx Program —the securities which defendant purchased and upon which he must base his claim for securities fraud. To be actionable under Section 10(b) and Rule 10b–5, misrepresentations or omissions must pertain to the securities themselves. *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Bochicchio v. Smith Barney, Harris Upham & Co., Inc.,* 647 F.Supp. 1426, 1429–30 (S.D.N.Y.1986).

### 2. *"Controlling Person" Liability.*

■ The defendant's assertion of "controlling person" liability under Section 20 of the 1934 Act, 15 U.S.C. § 78t, is hopelessly inadequate. As the Eighth Circuit noted in *Metge v. Baehler,* 762 F.2d 621, 631 (8th Cir.1985), *cert. denied,* 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986), the fact that a bank is a major lender to a particular company or individual does not establish "controlling person" status. Rather, the defendant must prove that the bank "actually participated in" the management operations of the controlled company. *Id.* Furthermore, there is a total absence of proof "indicating that [the bank] had any power to dictate the manner in which the allegedly fraudulent sales of ... partnership interests were made." *Schlifke v. Seafirst Corp.,* at 95, 445; *see also Wright v. Schock,* 571 F.Supp. at 664.

### III.

### CONCLUSION

Accordingly, plaintiff's second motion for summary judgment is hereby granted as to Bernard Edwards. The defendant's counterclaim is hereby dismissed with prejudice.

Within ten days of the entry of this Order, Seattle–First shall submit an affidavit and a proposed form of judgment which establishes the additional accrued interest since the original entry of judgment on May 29, 1984.